EVERETT E. WILLEY
BY HENRY E. WILLEY, PRO AMI

*vs.*

MAINE CENTRAL RAILROAD COMPANY.

HENRY E. WILLEY *vs.* MAINE CENTRAL RAILROAD COMPANY.

Penobscot.      Opinion, February 18, 1941.

*Stern and Stern,* for plaintiffs.
*Perkins & Weeks,*
*Frank Fellows,* for defendant.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, WORSTER, JJ.

HUDSON, J.   The plaintiffs except to orders of nonsuit and exclusions of testimony. The occasion of these actions was a lamentable accident that occurred on the twenty-fifth day of April, 1939, on the main line of the defendant company in the City of Brewer. Everett, six years old, who sues by next friend, was run over by its work train engine and received serious injuries necessitating the amputation of his right leg below his knee. For his personal injuries his suit is brought. His father, Henry, sues to recover expenses.

All directions herein given are taken from a sketch (no plan in the record), Plaintiffs' Exhibit No. 2, not drawn to scale nor purporting to show exactly the points of compass. If "north" as therein it appears is not correctly indicated, still there would be no relative change of position which would affect the issues in this case.

The accident happened about twenty minutes of one in the afternoon as Everett was on his way to school. His home was on the southerly side of Parker Street west of side track No. 5. Parker Street, running generally east and west, crosses this side track, and

a very short distance to the east the Bucksport branch, and a bit farther east the main line of the defendant company running from Bangor to Calais. Parker Street is located between two other streets, Wilson on the south and Center on the north. At all three of these street crossings were silent flashing signals then operating and manipulated by the defendant's employee, one Crocker, who for that purpose had a shack at the southeast corner of the Parker Street crossing. At its northeast corner was a switch, where the Bucksport branch left the main line proceeding southwesterly. The accident did not take place at any one of these street crossings but on the main line between Parker and Center Streets probably about 165 feet northerly of the shack and from 130 to 150 feet northerly of Parker Street crossing.

In the immediate vicinity of the place of accident there was a path running generally east and west. Whether it crossed the main line was in dispute, but taking the testimony most favorably for the plaintiffs, as here we must, it will be assumed that it did extend on both sides of the track. From it the path led easterly through a field and was used by children in going to and from school. Westerly of where it was claimed the path crossed the main line were two coal cars on track No. 5. The distance at this point between track No. 5 and the main line was approximately twelve paces.

Everett was in his first year in the Page School located near the high school some six or seven hundred feet easterly of the main line. After noon dinner at home, he went out to play with some other boys a bit older and then they started for school. Instead of going by Parker Street over the railroad crossing they took a short cut not on any street and when they had reached a pile of ties or sleepers on the easterly side of the main line just southerly of the path, Everett decided to go back to a neighbor's house to get his mask which he had forgotten. This was a cloth affair with eye-holes in it. (He had it on at the time of the accident.) Having gotten it, he started back for school by the same route. When he reached the coal cars on track No. 5, he went around their north end and there he observed the work train which, in order for a regular train to pass on the main line, had been switched onto the Bucksport branch. He said it was standing still "Down by the switch," but when he started from the coal cars to go across the main line, it had started and was distant

from him about eleven paces. Then he was about the same distance from the main line. Nevertheless, he continued on, thinking he had time to cross in safety. He tripped on the easterly rail, fell down, and while down was run over by the engine.

This work train, besides the engine and caboose, had some fourteen or fifteen cars and for a crew, besides the engineer and the fireman, a conductor and two brakemen. At the time of the accident, Crocker was in his shack performing his duties as signal tender. According to his testimony, when the engine proceeding at five or six miles an hour passed by him its bell was ringing, but whether it was ringing when the boy was hit he could not say for certainty because of the noise of the train between.

The record discloses that the locus of the accident was in an industrial portion of the city somewhat residential, and that with knowledge of Mr. Crocker very many children of all ages (many of whom, including Everett, had been warned by him) in going to and from school crossed these tracks wherever they saw fit and without express objection upon the part of the railroad company. Everett admitted, however, that he knew it was dangerous to go across the tracks except at crossings and that his father and mother had told him not to cross at other places.

The contention of the plaintiffs is that Everett had the status of an implied invitee to whom the defendant owed the duty of due care, while the defendant asserts that he was only a trespasser or at most a bare licensee to whom the company owed the duty simply to refrain from wilful, wanton, or reckless acts of negligence. Of that kind of negligence we find no evidence in this record. The railroad company defends the orders of nonsuit in particular on the ground that it breached no duty owed to Everett. "There can be no negligence where there is no duty." *Bowden* v. *Derby*, 97 Me., 536, 539, 55 A., 417, 418; *Leighton* v. *Wheeler*, 106 Me., 450, 452, 76 A., 916. And a declaration without allegation of facts sufficient to reveal the duty is defective and demurrable. *Hone et al.* v. *Presque Isle Water Company*, 104 Me., 217, 71 A., 769.

Plaintiffs' counsel relies upon the decision in *Collins* v. *Maine Central Railroad Company*, 136 Me., 149, 4 A. 2d, 100. He contends that the facts in this record pictured a situation from which the jury could have found that the railroad company impliedly invited

Everett to cross the tracks where he made his attempt so to do. But we think otherwise and consider the Collins case distinguishable. That was a *street railroad crossing* accident case; this is not. There a particular way was concerned that to the knowledge of the railroad company had been in general use by the public as a railroad crossing, on which the railroad itself had done work for the benefit of the travelling public: it had graded and planked it. This court said on page 153 of 136 Me., on page 103 of 4 A., 2d,

> "Our conclusion, then, is that, while an unobjected use by the public of a railroad crossing alone is not enough to establish an implied invitation, there may be facts as to its construction, maintenance, and use that will warrant a jury in finding such an invitation and such facts present, as said in *Black* v. *Central R. Co.*, supra, 'a question for the jury under proper instructions. . . .' "

In that case it appeared that the company itself had done something to create "appearances" reasonably interpretable as an invitation for use by the public. The most that the facts here warrant as a finding is that the railroad company had knowledge of the habit of these school children to cross these tracks between street crossings, to which it made no express objection, but that alone would not justify an inference of an implied invitation. In *Chenery* v. *Fitchburg Railroad*, 160 Mass., 211, 35 N. E., 554, cited in the Collins case on page 151, the presiding justice refused to instruct that if people were in the habit of using the crossing and the defendant had made no objection the plaintiff was not a trespasser, and the court upheld such refusal.

In *Copp* v. *Maine Central Railroad Company*, 100 Me., 568, 62 A., 735, the plaintiff was walking along the defendant company's railroad track when she was overtaken and injured by the defendant's locomotive. This court said on page 569 of 100 Me., on page 735 of 62 A.,

> "To extricate herself from the position of a trespasser upon the track, she showed that other persons *frequently and even habitually walked upon the tracks at that place without being forbidden by the defendant company*." (Italics ours.) "This however did not give her any right to walk on the track. Not

only was the railroad company entitled to the exclusive use of its track between crossings and stations as this place was, but she was forbidden by statute to walk upon it. R. S., ch. 52, sec. 77. That the defendant company did not prosecute violators of this statute did not legalize her act nor protect her from its consequences."

And again on page 570 of 100 Me., on page 736 of 62 A.,

"Of course, even if she were a trespasser, the defendant company's servants could not lawfully disregard her presence on the track and recklessly run over her, *but, even if she were a licensee as she claims, they owed her no special duty of care such as they owed to those whose right or duty it was to be on the track.*" (Italics ours.)

Said Sec. 77 of Chap. 52 now appears unchanged in effect in Sec. 67 of Chap. 64, R. S. 1930 and reads: "Whoever without right, stands or walks on a railroad track . . . forfeits not less than five dollars, nor more than twenty dollars, to be recovered by complaint. . . ." Sec. 66 of Chap. 64, R. S. 1930 denies recovery against a railroad company on account of one who is killed while walking or being on its road contrary to law, or to its valid rules and regulations.

In *Kapernaros* v. *Boston & Maine Railroad*, 115 Me., 467, 99 A., 441, 442, a child not quite two years old was killed while playing on the defendant's railroad track at a point other than at a crossing. It was claimed that the child reached the track by pursuing a well-defined path leading from the lot occupied by his parents. Referring to the two statutes above cited, this court held that the child was a trespasser and said: "Being a trespasser, the defendant owed the plaintiff no duty save to refrain from wantonly or wilfully injuring him."

Established law in this state requires us to hold that on this record there is no fact foundation for according Everett any status other than a trespasser or at most a bare licensee.

But should the cases have been submitted to the jury on the question of last clear chance? We think not, for the reason that the evidence is barren of any proof that after the defendant actually saw or should have seen Everett in his perilous position on the track, it

failed in any way to exercise due care to avoid the accident. No evidence in the case would have justified the jury in finding any subsequent and independent negligence upon the part of the defendant necessary for application of the last clear chance doctrine.

The plaintiffs have failed to show error under their twelfth exception as to orders of nonsuit.

Of the remaining eleven exceptions, ten of them, as stated in the plaintiffs' brief "present essentially the same questions of law and may be considered together. The evidence offered was 'for the purpose of showing the nature of the crossing and the notice to the railroad at a hearing subsequently for the purpose of changing that protection.' "

The first question objected to and excluded was: "How were those gates operated, manually or automatically?" referring to gates formerly at Parker Street crossing.

The second question excluded related to former gates at the Center and Wilson Street crossings.

The third exception is to the ruling of the presiding justice striking from the record testimony previously admitted that there had been gates at Parker Street crossing.

The fourth exception is to the exclusion of this question to Mr. Willey: "When you first moved there was the crossing the same as it is now?" having reference to the Parker Street crossing. The purpose of this question no doubt was to show that previously there had been gates which later were removed. The removal was by order of the Public Utilities Commission and the gates were supplanted by another permitted method of protection.

The fifth exception is extremely vague and does not appear to result from a ruling on any particular question but from what was said in colloquy between the court and the attorney. The court then expressed the opinion that up to that time in the trial it had not been shown where the boy was when he was hurt. Then followed a discussion as to what inferences might be drawn in that regard.

The sixth exception is to a statement by the court that "the offered evidence as to the proper condition of the crossing or the protection thereof is excluded upon the ground that no evidence yet has been submitted to show where this boy who was injured was crossing the track, whether it was at the crossing or where it was, and there-

fore the evidence as to the crossing at this time is not admissable."

The seventh exception also resulted from a colloquy (no specific question excluded) and related to a statement of the attorney that he would offer evidence to show "the knowledge and notice of the company of the conditions at this crossing, and not only at the crossings but between them and all over the place described in the declaration." This was not definitely ruled out by the court. It stated: "If that evidence is admissible at all it will be later in the case after it has been shown where the boy was injured."

By the eighth exception the plaintiffs attack the exclusion of testimony as to the conditions at the Wilson Street crossing before the accident.

The ninth exception is to the exclusion of a question to Mr. Willey as to his having seen children "along the streets and crossing the streets there . . . a year or two before the accident, or three or four years before the accident."

The tenth exception is to the exclusion of this question asked Mrs. Willey: "From June, 1938, until the time of this accident as you had observed it, how many men had been stationed at those crossings at Parker Street, Wilson Street and Center and Jordan Street, do you know?" Following its exclusion, counsel for the plaintiffs said: "I offer to prove there was only one. I would like to offer evidence for the record." The court then said: "I think you might offer it by some witness who knows more about it than this woman." Then followed questions and answers as to her means of knowledge. Whereupon she was permitted to state with reference to these street crossings that for a year before the accident she never saw anyone there. Thus, the evidence sought to be introduced, first excluded, was let in and consequently plaintiffs were not prejudiced.

The purpose of the offer of all of this excluded testimony, excepting a part of that embraced in exception seven, was to show conditions at some one of the three street crossings in that vicinity, but at no one of which did the accident happen. As to exception seven, it will be noted that evidence relating to conditions between crossings (where it should appear that the accident happened) was not excluded. As a matter of fact, no specific question was before the court requiring a ruling. What the judge did was to indicate a ruling if and when a question should be asked.

But dealing with the question raised by the exceptions as to the admissibility of conditions at the railroad crossings at no one of which it was claimed the accident took place, we feel that the ruling of the presiding justice excluding such testimony was right. If the accident had happened on a railroad crossing which the boy was lawfully using and so was entitled to the exercise of due care upon the part of the defendant, the then conditions at that crossing and the knowledge of the defendant as to facts bearing upon what protection should have been afforded by the defendant in its exercise of due care would have been admissible. It cannot be denied that the function of gates is to protect those using the particular crossing where the gates are installed. The failure to maintain gates at a given crossing, it would seem, could have no bearing on an issue of negligence with regard to an accident occurring elsewhere. Such evidence would be irrelevant and immaterial.

Not here necessary for decision because this accident did not happen at a railroad crossing, *quaere* whether evidence of a prior protective means afterwards supplanted by another at a crossing would be admissible as an admission of negligent protection at the time of a later accident at such crossing? *Menard* v. *Boston & Maine Railroad Company*, 150 Mass., 386, 388, 23 N. E., 214 ; and *Tyler* v. *Old Colony Railroad Company*, 157 Mass., 336, 32 N. E., 227, seem to answer no.

We find no merit in exceptions one to ten inclusive.

The remaining eleventh exception is to the refusal of the presiding justice to allow plaintiffs' witness, Mrs. Willey, although she did not seek so to do, to refresh her recollection as to what another witness for the plaintiffs, Mr. Crocker the signal tender, had said in his shack a few days after the accident "with reference to what the engineer and fireman were doing in the engine." That proffered as a means of refreshment was an unsigned writing claimed to be under the hand of the plaintiffs' attorney and to contain an accurate statement of what Mr. Crocker then and there said. The court denied the right of refreshment. It having ruled that Mr. Crocker was a hostile witness, the plaintiffs were attempting to show that he had given a different version on the stand from that which appeared in the writing.

Where a writing is shown to a witness for refreshment, whether

written by him or not, which when made or shortly thereafter while the facts are still within his memory he then knew contained a correct statement, he may testify as to its contents if material even though at the time of testifying he has no independent recollection of the facts therein stated. *Chamberlain* v. *Sands et al.*, 27 Me., 458, 466. Also see *Bradley* v. *Davis*, 26 Me., 45, 54; *State* v. *Lull*, 37 Me., 246, 248. In *Pierce* v. *Bangor & Aroostook Railroad Company*, 94 Me., 171, on page 177, 47 A., 144, on page 146, this court stated:

"A witness may be allowed to assist his memory by referring to writings, 'where the witness recollects having seen the writing before, and though he has now no independent recollection of the facts mentioned in it, yet he remembers that, at the time he saw it, he knew the contents to be correct.' 1 Greenleaf on Evidence, Sec. 437."

Also see *Guiffre* v. *Carapezza*, 298 Mass., 458 (1937), 11 N. E., 2d, 433; *Kinsey, Appellant* v. *State of Arizona, Respondent*, 65 P. (2d), 1141 (Arizona) (1937); for annotation see 125 A. L. R., 80 *et seq.*

Mrs. Willey did not testify that at the time the writing was made or soon thereafter she knew the contents to be correct. She did not even testify that she read it herself or heard it read. Thus, the foundation for the use of the writing as a refreshment was not properly laid to comply with the rule as stated in the above-cited cases.

Furthermore, the writing is not printed in the bill of exceptions nor made a part thereof. Whether an examination of it would disclose any contradictions in what was said by Mr. Crocker on the stand and in the shack we cannot determine. It is not before us.

"The document in question is not made a part of the bill of exceptions by direct quotation, nor is it incorporated therein by reference. It did not become a part of the evidence. It is not, therefore, included in the blanket clause which made the evidence in the case a part of the bill. It is the well settled rule in this state, too well settled to be now shaken, that the excepting party in his bill of exceptions must set forth enough to enable the court to determine that the point raised is material and that the ruling excepted to is both erroneous and prejudicial,

or he can take nothing by his exceptions." *Sawyer* v. *Hillgrove*, 128 Me., 230, 232.

Also see *Gross* v. *Martin*, 128 Me., 445, 446, 148 A., 680; *Pike* v. *Crehore*, 40 Me., 503, 512.

The fact that the attorney read a sentence or two from an unmarked and unidentified paper relating to the ringing of the bell and the positions of the brakemen (nothing read had to do with the question asked and objected to as to what the engineer and fireman were doing in the engine) did not divulge what it was claimed Mr. Crocker then said in the shack for comparison with what he later said on the witness stand. Inspection of the whole writing might well reveal no contradictions. *Gross* v. *Martin*, supra, 128 Me., at page 446, 148 A., 680.

An exceptant "is bound to see that the bill of exceptions includes all that is necessary to enable us to decide whether the rulings, of which he complains, were or were not erroneous." This writing "should have been printed as a part of the bill of exceptions." *Gross* v. *Martin*, supra, 128 Me., at page 446, 148 A., at page 681. A bill must affirmatively show the grievance. It cannot be left to inference. *State* v. *Wombolt*, 126 Me., 351, 353, 138 A., 527; *State* v. *Dow*, 122 Me., 448, 449, 120 A., 427. The plaintiffs take nothing under exception eleven.

*Exceptions overruled.*